**AMERICAN–MARIETTA COMPANY,**
Plaintiff,

v.

**Harry KRIGSMAN and Harold Miller,
d/b/a Jamick Manufacturing Co.,
Defendants.**

Civ. A. No. 19150.

United States District Court
E. D. New York.

Dec. 22, 1958.

Opinion Modified March 10, 1959.

See 170 F.Supp. 770.

**646**

Alexander, Maltitz, Derenberg & Sullivan, New York City, Schneider, Dressler, Goldsmith & Clement, Chicago, Ill., by Louis Kunin, New York City, R. Howard Goldsmith, Chicago, Ill., of counsel, for plaintiff.

Kenyon & Kenyon, New York City, by Ralph L. Chappell and Richard A. Huettner, New York City, of counsel, for defendants.

BYERS, Chief Judge.

This is a plaintiff's motion for a temporary injunction in an unfair competition case. The device involved is a floor mop, the essential operating element of which is a synthetic sponge, made of a cellulose compound that resembles sponge rubber in appearance and function.

That element is squeezed dry of moisture content by the pressure of a back plate, manually applied to accomplish the desired result without contact between the hands of the user of the mop and the sponge itself.

The sponge is held in position by a metal base, into which a handle is inserted for ease in conducting the mopping operation. When a sponge is worn out, it is replaced by a refill, so that the useful life of the mop as a whole is thus a matter of years, because the metal holder and the back presser are of substantial and lasting construction, and are practically rust proof.

The case as developed at the hearing, and as shown in the affidavits pro and con, is unusual in that the accused device is conceded to be practically identical with the plaintiff's product in construction, dimensions, and appearance.

The same is true as to the refills, including the cellophane wrapping thereof, as to color and appearance, except in respect of wording on the wrappers, of which more will be said. The sale of refills is an important element in the business of both parties.

The reason for the identity in the two devices in all material and visible respects is to be found in the history of the making and marketing of the mop, which can best be understood by a brief reference to the parties and their predecessors.

### Parties.

Plaintiff is an Illinois corporation having acquired all the property and goodwill of O'Cedar Corporation. For convenience it will be referred to as O'Cedar.

The defendants are individuals doing business in Brooklyn as partners, under the trade-name of Jamick Manufacturing Company. They purchase the parts of their product from Crown 400 Corporation, an Illinois corporation of which Nathaniel B. Greenleaf is president and treasurer. His role in the entire situation under examination is of great importance. The defendants assemble the parts and market the mop in its completed form.

Crown 400 was organized by Greenleaf to manufacture and sell the mop in the United States, after the termination of a license agreement which he had entered into in 1949 with O'Cedar, which termination became effective November 15, 1957.

He had assigned his rights under that license agreement—in August of 1949—to Sponge Products Company, also an Illinois corporation. It seems therefore that the latter was in the legal position to authorize Crown 400 to manufacture and sell, which would explain why the latter is the source of the defendants' supply of parts.

Greenleaf is also president and treasurer of Sponge Products, and president and board chairman of "O'Cedar of Canada," a Canadian corporation of Stratford, Ontario, Canada.

Recurring to 1949, it was in that year that Greenleaf originated the said mop and thereafter procured letters patent in the United States upon the mechanical device, but not its design. Either or both

of those patents seemingly were adjudged to be invalid (this is an over-simplification but will presently suffice), and it was for that reason, as now stated, that O'Cedar terminated the 1949 license agreement with Greenleaf as of November 15, 1957.

During the eight years that the license was in effect, O'Cedar built up a large and lucrative business in what came to be known as the O'Cedar Mop.

This was accomplished as the result of the expenditure for advertising of a total sum of $5,297,000 from August of 1949 through the year 1957.

The sales for that period in dollars was $24,465,000 in mops, and $10,059,000 in refills.

These figures have not been challenged and are consistent only with the establishment of so considerable a volume of business that the inference is compelling that the public had come to identify the O'Cedar mop with the plaintiff as the source of production. If secondary meaning is challenged, which is none too clear, the figures go far to answer the challenge. The unit sale in mops grew from 134,000 in 1949 to 1,142,000 for nine months of 1957. The refills grew from 16,000 in 1949 to 1,580,000 in the same period of 1957.

During the years that the Greenleaf license to O'Cedar was in effect, royalties were paid in the total sum of $704,866 to Sponge Products Corporation as assignee of Greenleaf. Thus the process of creating and expanding plaintiff's business and good-will yielded a very substantial contribution to the Greenleaf exchequer, between 1949 and 1957.

The license agreement granted by Greenleaf seemingly permitted O'Cedar to manufacture and sell the mop in the United States, as described in his then pending applications for patent which were filed in the U. S. Patent Office on December 21, 1948.

O'Cedar began operations pursuant to the license in August of 1949 and registered its trade-mark O'Cedar for dust mops and refills; as to the former, in 1950 (two registrations), and as to the latter, on January 7, 1958, and adopted the design of the entire product which Greenleaf had originated.

The Canadian activities of Greenleaf during the period embraced by the duration of the license must be understood in connection with the entire controversy. He operated in that market, i. e., produced and sold the said mop according to the form and in the design heretofore stated, through a corporation named "O'Cedar of Canada" under the trademark "Chan No. 10." Had he chosen to use the trade-mark of the plaintiff in his Canadian business, he would have had to pay a royalty to the plaintiff, according to a license agreement in which the latter was licensor. Seemingly that was never done. However, the plaintiff's own advertising matter in many of its forms contained this wording "O'Cedar Corpn. Chicago Illinois" and separately, "O'Cedar of Canada Ltd. Toronto Canada." The reason for this usage has not been explained, and invites no comment.

The situation confronting Greenleaf upon receiving notice of the cancellation of the license by plaintiff, was that he had facilities for the production and sale in the United States, of the mop which he had been making and selling in Canada, which was identical with "O'Cedar 76."

Thus the competition which the plaintiff asserts to be unfair, was not the manufacture and sale of a wholly unrelated and new device which closely simulated that of the plaintiff, but an effort to continue to furnish to the public the same article under the trade-mark "Crown 400" which had obtained its own commercial identity under the plaintiff's trade-mark "O'Cedar 76."

Obviously the issue of alleged unfair competition is thus straitly confined.

### Competing Devices.

Enough has been stated on this subject to indicate that as to the mops, they were practically indistinguishable in appearance. No argument is made to the contrary.

The plaintiff's mop here in suit was marketed under the name "O'Cedar 76 Sponge Mop" until March of 1958, when a new model was put on the market by plaintiff under the name and style of "New O'Cedar 76 Sponge Mop."

The differences are of design, and are not readily apparent. Counsel stated them in the record at pages 99 to 103, and they need not be here repeated; the visual distinctions between the former and the new models are difficult to discern.

The defendants' product is marked under the name of "Crown 400 Sponge Mop" which name appears on the mop, accompanied by numbers said to be those of the Greenleaf patents.

## The Refills.

The sponge elements which are sold separately, as stated, are wrapped in cellophane.

The color scheme of that envelope as adopted by the plaintiff is striking in effect, being generally blue overall, and so made up as to present a kind of confetti appearance as to the entire wrapper.

The defendants have made almost the proverbial Chinese copy of this kind of trade dressing. There is no argument made that this was done inadvertently. The purpose to simulate the plaintiff's sponge as it is offered to the public, is too obvious to justify exposition. As to this effect, counsel for defendant agreed (page 196).

The wording on the wrapper or envelope adopted by defendants contains the words "Crown 400 Sponge Mop" and "Jamco" and the following "This refill fits the O'Cedar 76 and Crown 400."

The first reference is to the plaintiff's mop, rather than to the defendants', and while the statement is literally true, in the opinion of this court it is consistent only with a purpose to suggest to the purchaser that the refill itself is a plaintiff's product, for not otherwise would it be put out in the trade dressing which is an accurate reproduction of the plaintiff's.

The bearing of this aspect of defendants' practice, upon the controversy will be considered presently.

## The Issues.

1. Does the identity of the mops in design, component parts and finish, demonstrate unfair competition?

2. Has the plaintiff demonstrated an unfair invasion of its existing business?

3. Is there a showing of unfair competition as to the refills?

4. Should a temporary injunction issue?

As to the first, this court cannot find for the purposes of this motion, that it is unfair competition on the part of Greenleaf, i. e. his Illinois corporations, to seek to recapture a distribution of mops of his own design and configuration, that was the source of considerable revenue during the term of the license agreement which ended on November 15, 1957.

The fact that the plaintiff's development of that business through the years, yielded revenue to Greenleaf perhaps constrained him to be circumspect in the methods to be employed by him in seeking to fill the void in his operations, which resulted from the cancellation. The adoption of the trade-mark "Crown 400" was consistent with that requirement.

Since these defendants are operating somewhat under the shield of the Greenleaf status, the assembly of the parts, and the marketing of the mop under the trade mark "Crown 400" is deemed to fall within the reasoning that would apply to Greenleaf. As to this aspect of the motion for a temporary injunction, the plaintiff has not prevailed.

The second question need not be answered unless the views of this court are incorrect as to the first.

The present interest of the plaintiff concerning the business of manufacturing and selling its former model "O'Cedar 76" has to do only with protecting such of that stock as is now in the inventories of its distributors (speak-

ing as of November 5, 1958, when notice of motion was given), and of the likelihood that it will be called upon by one or more consumers (household users) to make good its original five-year guarantee. The motion papers are not so factually informing to justify granting the extraordinary remedy now sought. The impression created upon the court is, that so far as distributors are concerned, they were sufficiently warned of the introduction of the new model in advance thereof, to enable them to close out most of their inventories.

No specific instance is given of a user's attempt to enforce the plaintiff's guarantee as to the old model, to justify intervention pendente lite in that connection.

The answer to the third question is distinctly in the affirmative. The importance of the refill business is shown by the figures quoted.

The adoption of a trade-dress which is obviously a copy in coloring, construction and design of material (the decoration of the cellophane) and the use of the words "This refill fits the O'Cedar 76, etc." constitutes in my opinion an attempt by the defendants to unfairly compete with the plaintiff for the latter's refill business, and should so be dealt with.

The defendants rely principally upon the following cases in which the facts are foreign to those under examination. Each contains a statement of the applicable rules of law, which will be quoted:

Electric Auto Lite Co. v. P. & D. Mfg. Co., 2 Cir., 78 F.2d 700, at page 703:

"* * * The wrong in unfair competition consists of the sale of goods of one manufacture as those of another, but where, as here, the defendant has conducted its business so as not to palm off its goods as those of the plaintiff, there is no unfair competition."

There was no showing in that case comparable to the wrapping of the plaintiff's or use of the plaintiff's trade-mark "O'Cedar 76." There were present, however, statements in catalogues and labels with respect to replacement parts "to fit Auto-Lite" and this was held not to constitute unfair competition. The case is clearly distinguishable from this.

Columbian Art Works v. Defiance Sales Corp., 7 Cir., 45 F.2d 342:

This is an unfair competition case involving calendar pads, etc. An injunction had been granted by the District Court, which was upheld in part. The portion of the opinion upon which these defendants apparently rely is on page 344 (Referring to carton marking):

"There is nothing in this language to convey to the purchaser the impression that the pads offered for sale by appellant are 'Perfection,' 'Gem,' or 'Jumbo Gem' pads, or that they are made by appellee."

That is precisely inapplicable to the cellophane wrapper employed by these defendants as this court has examined it at the hearing. Therefore the quoted language which was the basis for vacating a portion of the injunction granted by the District Court, contains no helpful teaching in this case.

National Enameling & Stamping Co. v. White, D.C., 19 F.Supp. 108: This was a patent infringement suit, and as to alleged unfair competition, involved the sale of lamp wicks. In that connection, the opinion states (at page 111):

"Plaintiff's wick was marked with no name whatever"

and on page 112:

"As to unfair competition in trade, it is clearly shown that defendant does not copy any nonessential elements of the patents and does mark its product with the name of his company as manufacturer and does not copy the plaintiff's package."

The distinction between that case and this seems to be obvious.

If a finding were appropriate it would be that these defendants have been shown to have practiced unfair competition with the plaintiff as to refills in seeking to create the impression that the sponge

element of the mop, sold by them, is actually the product of the plaintiff.

It results from the foregoing that the plaintiff is entitled to a temporary injunction against these defendants, from offering for sale the sponge element of the "Crown 400 Mop" or any other mop of like character, appearance or design, in any wrapping of any material whatever which shall present the general appearance of that used by the plaintiff, in the matter of color scheme, including the so-called confetti appearance of the wrapper, and from using in connection therewith the plaintiff's trade-mark "O'Cedar" or the designation "O'Cedar Model 76."

The order is to be settled on notice, and if the parties cannot agree upon the amount of the bond to be filed and posted by plaintiff, the court will fix the sum, after weighing whatever contentions on the subject the parties may submit in brief written form.

Settle order.